447 S.E.2d 16

**STATE ex rel. CLARKSBURG MUNICIPAL BUILDING COMMISSION and the City Council of the City of Clarksburg, West Virginia, Petitioners,**

v.

**David E. SPELSBERG, Secretary of the Clarksburg Municipal Building Commission, Respondent.**

No. 22312.

Supreme Court of Appeals of West Virginia.

Submitted June 28, 1994.

Decided July 18, 1994.

---

**554**

George E. Carenbauer, Vincent A. Collins, Steptoe & Johnson, Clarksburg, for petitioners.

H. Laban White, Peter J. Conley, Siegrist, Spelsberg, White, Martin & Conley, Clarksburg, for respondent.

NEELY, Justice:

The Clarksburg Municipal Building Commission (the Commission), and the City Council of the City of Clarksburg (the Council), seek a writ of mandamus to compel the respondent, David E. Spelsberg, Secretary of the Building Commission, to execute, on behalf of the City of Clarksburg, an Agreement and Lease (the Agreement), between the City of Clarksburg and the Clarksburg Municipal Building Commission.

The City Council determined that the existing city hall and municipal building is obsolete, inadequate and not economically repairable, and that a new municipal building is in the public interest. The Council contends that the Agreement is necessary to finance the new buildings through the issuance of bonds, which would then allow the Building Commission to lease the buildings to the City. Secretary Spelsberg refused to execute the agreement until this Court determines whether the agreement creates an unconstitutional debt in violation of the *W.Va Const.* art. X, § 8 [1] or in violation of *W.Va. Code,* 11–8–26 [1963] [2].

1. "§ 8. No county, city, school district, or municipal corporation, except in cases where such corporations have already authorized their bonds to be issued, shall hereafter be allowed to become indebted, in any manner, or for any purpose to an amount, including existing indebtedness, in the aggregate, exceeding five per centum on the value of the taxable property therein to be ascertained by the last assessment for State and county taxes, previous to the incurring of such indebtedness; nor without, at the same time, providing for the collection of a direct annual tax on all taxable property herein, in the ratio, as between the several classes or types of such taxable property, specified in section one of this article, separate and apart from and in addition to all other taxes for all other purposes, sufficient to pay, annually, the interest on such debt, and the principal thereof, within, and not exceeding thirty-four years. Such tax, in an amount sufficient to pay the interest and principal on bonds issued by any school district not exceeding in the aggregate three per centum of such assessed value, may be levied outside the limits fixed by section one of this article: Provided, that no debt shall be contracted under this section, unless all questions connected with the same, shall have been first submitted to a vote of the people, and have received three fifths of all the votes cast for and against the same."

2. "Except as provided in sections fourteen-b, twenty-five-a and twenty-six-a [§§ 11–8–14b, 11–8–25a and 11–8–26a] of this article, a local fiscal body shall not expend money or incur obligations:
    (1) In an unauthorized manner;
    (2) For an unauthorized purpose;
    (3) In excess of the amount allocated to the fund in the levy order;
    (4) In excess of the funds available for current expenses.
    Notwithstanding the foregoing and any other provision of law to the contrary, a local fiscal body or its duly authorized officials shall not be penalized for a casual deficit which does

The current city hall and municipal building was built over one hundred years ago and originally served as a post office. Numerous and costly improvements are needed for general use and to comply with the Americans with Disabilities Act ("ADA"), fire codes, and health and safety requirements, including asbestos removal. A sprinkler system is needed, and the stairwells need to be enclosed, requiring the building to be redesigned. To comply with the ADA, an elevator will need to be installed and asbestos will need to be removed at a projected cost of $500,000.

The roof needs to be replaced, and the outdated heating and electrical systems must be upgraded. Parking facilities are needed to replace limited street parking that cannot adequately accommodate the Police Department, visitors, the handicapped, deliveries, and trash removal. In addition, there is insufficient space to store the police records and evidence required by law to be stored.

The current building lacks appropriate electrical circuits for computers, and to install the proper wiring will require costly renovations. There is no room adequately to house existing municipal departments. Nor is there room to accommodate future growth without acquiring adjacent buildings because there is no room on the site for expansion.

The City studied the option of renovation of the existing facility and determined that it would be more expensive than moving into an entirely new building. There is no preexisting property in Clarksburg available for rent that could accommodate essential administrative needs such as secured areas for police interviews and chambers for City Council meetings, and at the same time offer a central location accessible to the public. As a result of these findings, the City determined that an entirely new facility should to be built.

## I

The City instructed the Building Commission to acquire property, and to design, construct, and equip a municipal building to accommodate administrative offices including the municipal court, city council chambers, a police station, and other administrative offices. The Building Commission is authorized to take this action pursuant to *W.Va. Code* 8-33-4(f) [1968] which empowers it to:

(1) Acquire, purchase, own and hold any property, real or personal, and (2) acquire, construct, equip, maintain and operate public buildings, structures, projects and appurtenant facilities, of any type or types for which the governmental bodies creating such commission are permitted by law to expend public funds....

The Commission is also authorized to dispose of or lease its property for public purposes, and to issue negotiable bonds, notes, debentures, or other evidences of indebtedness and provide for the rights of the holders thereof, incur any proper indebtedness and issue any obligations and give any security therefor which it may deem necessary or advisable in connection with exercising its powers. *W.Va.Code* 8-33-4(*l*), (i) [1968].[3] In light of the City's inability to raise additional taxes or set aside an individual source of revenue to pay for construction of the new municipal building, coupled with the inability of the City to obtain state or federal grants, the Building Commission found it necessary to provide bond financing for this project.

not exceed its approved levy estimate by more than three per cent, provided such casual deficit be satisfied in the levy estimate for the succeeding fiscal year."

3. *W.Va.Code* 8-11-4(i) and 8-33-4(*l*) states that:

"Each commission shall have plenary power and authority to:

.  .  .  .  .

(i) Issue negotiable bonds, notes, debentures or other evidences of indebtedness and provide for the rights of the holders thereof, incur any proper indebtedness and issue any obligations

and give any security therefor which it may deem necessary or advisable in connection with exercising powers as provided herein;

.  .  .  .  .

(*l*) Lease its property or any part thereof, for public purposes, to such persons and upon such terms as the commission deems proper, but when any municipality or county commission is a lessee under any such lease, such lease must contain a provision granting to such municipality or county commission the option to terminate such lease during any fiscal year covered thereby...."

As a result, the Building Commission secured a financing commitment from the United States Department of Agriculture and the Farmer's Home Administration ("FmHA"), and seeks now to issue bonds pursuant to an indenture of trust.[4] The Agreement specifies that the City will make monthly rental payments of $20,511 to the Building Commission. This money will then be used by the Commission to retire the bonds.

Under the thirty year rental Agreement, the City will make periodic payments as services are furnished. If the City refuses to appropriate funds for additional rental payments, there is no obligation for the City to renew the Agreement at the end of each fiscal year. Should the City decide to terminate the Agreement, it is FmHA, not the taxpayers, that has assumed the risk of non-appropriation.

Once all rental payments under the Agreement have been made, the City may purchase the new municipal building from the Building Commission for ten dollars. The Agreement incorporates the requirement that it must be executed by the Secretary to be valid. Secretary Spelsburg refuses to sign until this Court rules on the legality of the Agreement under *W.Va. Const.* art. X, § 8 and *W.Va.Code* 11–8–26 [1963], dealing with debt limitations.

## II.

This is a standard municipal bond issue such as we approved in *State Ex Rel. W. Va. Resource Recovery–Solid Waste Disposal Authority v. Gill,* 174 W.Va. 109, 323 S.E.2d 590 [1984], *overruled, in part, on other grounds,* establishing that funds from general revenues, and not just "special revenues"[5], could be used to make payments to retire bonds for "necessary services" such as utilities. *Gill* upheld the constitutionality of the use of state general revenues to discharge

bonds used to finance a steam generation plant at West Virginia University. The legitimacy of these exceptions to the general prohibition against financing bonds by proceeds ultimately derived from the general revenue of the State was subsequently challenged on two recent occasions in *State ex rel. Marockie v. Wagoner,* 190 W.Va. 467, 438 S.E.2d 810 [1993]; *Winkler v. West Virginia School Bldg. Auth.,* 189 W.Va. 748, 434 S.E.2d 420 [1993].

We have identified certain circumstances that will exempt bonds from the constitutional debt limitations of Article X, Section 4.[6] The provisions of Article X, Section 8, relate to debt incurred by local units of government, and governs the outcome in this case. However, the provisions in Section 8 are similar to Section 4 and have been interpreted in a similar manner. *see State ex rel. City of Charleston v. City Hall,* 190 W.Va. 665, 669, 441 S.E.2d 386, 389 [1994]. In Syl. Pt. 1, of *Marockie, supra* and Syl. Pt. 6, of *Winkler, supra,* this Court held:

"Section 4 of Article X of the West Virginia Constitution is not designed to prohibit the State or the state's agencies from issuing revenue bonds that are to be liquidated from contracts requiring rental payments from another state agency or from contracts for necessary services such as utilities; nor does this constitutional provision preclude the issuance of revenue bonds which are to be redeemed from a special fund."

We hold that the same rationale is applicable to Section 8 of Article X, and the bonds in this case clearly qualify under these exemptions.

The underlying purpose of debt restrictions is to "protect the fiscal integrity of the State by prohibiting creation of any present indebtedness that would obligate subsequent legislatures to make appropriations." *Gill,*

---

4. FmHA offered to finance the bonds at an interest rate of 5½%, payable over thirty years.

5. Special funds are usually a tax or fee generated from the facility itself, like tolls from highways or bridges, and parking garage fees. *See Winkler v. West Virginia School Building Authority,* 189 W.Va. 748, 757, 434 S.E.2d 420, 428 [1993].

6. Art. X, § 8 deals with limitations on the bonded indebtedness of counties, cities, and other municipalities; Art. X, § 4 deals with similar limitations on incurring State indebtedness, without voter approval. The underlying objectives of both sections are the same, to limit the power to incur debt, and define the circumstances when debt would be acceptable.

174 W.Va. at 111, 323 S.E.2d at 592–593 (cites omitted). In *Winkler* we concluded that the Court must look beyond the plain language of the agreement, and consider the practical consequences that will result when we determine whether the fiscal integrity of the State is unconstitutionally, or unlawfully compromised. *Winkler*, 189 W.Va. at 758, 434 S.E.2d at 435. *See also*, Neely, J. concurring in *Winkler*, 189 W.Va. at 766, 434 S.E.2d at 438.

The Agreement in question poses no threat to the future indebtedness of the State or the municipality, and it offers a way to finance a much needed project that will ultimately enhance administrative efficiency, while saving taxpayers the burdensome costs of refurbishing an archaic building to meet needs that the building cannot meet. In this regard the costs and benefits of the new municipal building are more or less definitely ascertainable, unlike the speculative benefits and open-ended costs that we found unconstitutional in *Winkler*. Indeed, in all of these cases an initial question is whether the *means* have become the *ends;* in other words, are there primary ascertainable political benefits that will inure to the officials who issue the bonds because of new construction jobs, contracts, and other patronage from the construction of the project, or is there a definitely ascertainable need that *must be met* and bond financing is the most practical or only way to meet that need? The record shows that it will be cheaper to build a new facility than to upgrade the existing one. The current facility, in addition to being too small, unable to accommodate expansion, and permeated with asbestos, costs taxpayers $220,000 per fiscal year just for maintenance and operation.

The new municipal building will have over 22,000 square feet, enabling it to accommodate double the number of existing employees, and can be maintained at an estimated cost of $135,000 per year. The new building will create a savings of $85,000 per year in maintenance costs alone.

## III.

Today we rely on the "quasi revenue" bond cases where the government agrees to pay rent for a new building that is technically owned by the bondholders. In such cases, the security for the bonds is the building itself, and if the government finds cheaper facilities, under the agreement the government is free to go elsewhere, leaving the bondholders without recourse. This is the situation in this case. The key, again, is that here there is a measurable need that can be met cheaply and efficiently by the issuance of "quasi revenue" bonds.

There are also built-in constraints protecting the State from compulsory, indefinite indebtedness, that attach by virtue of the nature of this building, and the structure of the lease agreement itself.[7] The building will primarily serve as an office building. As a result, unlike the bond issue in *Winkler* involving the construction of a school (a building of limited alternative use or revenue generating potential), there is a marketable non-governmental use for this structure. Should the City choose not to continue the Agreement, it is conceivable that the property could be rented out to non-governmental tenants.

In addition, although the bonds are being retired by rental payments by the City, in a very technical sense, there is no long term indebtedness exposing the City to liability in the event of breech. The Agreement imposes no obligation upon the City to continue to rent. If the City votes against appropriating revenues to continue making rent payments, it's FmHA who takes a bath, not the taxpayers. This falls within the categories of cases where we have previously allowed bonds to be issued without voter approval.

This Agreement does not contemplate unrestrained creation of debt through the issuance of these bonds. This lease agreement allows for monthly payments for a fixed period, where the amount to be repaid is ascertained by the pre-determined cost of the building. In *Winkler*, a primary consider-

---

7. "[T]hese funding sources, which we have approved in earlier cases, have built in restraints that must be considered by the Legislature when it authorizes legislation for the issuance of the bonds." *See Winkler*, 189 W.Va. at 758, 434 S.E.2d at 430.

ation for the Court's refusal to approve of the school bonds at issue in that case was that, "unlike special fund or lease payment bonding, there is no identifiable source that controls the total value of bonds issued". *Winkler*, 189 W.Va. at 758, 434 S.E.2d at 430. We have also noted that an additional requirement for bonds to be validly issued without voter approval is to identify a particular source of funds for the payment of the bonds. *Winkler, supra* note 19. Both requirements are satisfied under the Agreement in this case. The City must have a City Hall (after all, that's what cities basically do—administer cities from city halls) and it will pay the "rent" in question in this case one way or another if it plans to remain a city.

In general, we have approved bond-funded projects that created measurable benefits that directly translated into earned or saved tax dollars. *Winkler, supra,* 189 W.Va. at 776, 434 S.E.2d at 448. (Neely, J, concurring). The work performed by administrative agencies is important to keep the City's economy functioning smoothly. In this case, it has been determined that the cost to taxpayers of a new facility financed through the proposed bond and lease Agreement is less than the foreseeable costs of continued worker inefficiency and increasingly costly maintenance and repairs which necessarily accompany buildings that are over one hundred years old. Although the line demarking the permissible from the impermissible may not be bright-line and crystal-clear, deciding matters like this in the gray areas are what courts are for.

## IV.

This project is reasonably calculated to save the City, and therefore the taxpayers, money. Furthermore, the financing structure of the bonds in question relies on a lease/purchase agreement, and will be secured by the building the bonds are being issued to construct.[8] Section 8 of Article X of the West Virginia Constitution is not designed to prohibit one municipal agency, the Building Commission, from issuing revenue bonds that are payable from rents from another municipal agency, the City, under the terms of the lease agreement in this case.

This contract is for a thirty-year term, permitting periodic payment as services are furnished. It incorporates non-binding cancellation clauses such that there is no present indebtedness for the aggregate of all the installments. Furthermore, the contract can be terminated at the end of each fiscal year, at the City's discretion, if the City decides not to appropriate additional funds for payment. Upon conclusion of the thirty year term, if all payments under the lease have been made, the City may purchase the building from the Building Commission for a mere ten dollars. It is clear that both the language of the bond agreement, and the practical effect of this agreement, imposes no legal obligation on the City to make appropriations to be used to pay for the bonds.

Because we conclude the bonds at issue in this case do not violate *West Virginia Constitution*, art. X, § 8, nor are they in violation of the *W.Va.Code*, 11–8–26 [1963], the writ of mandamus for which petitioner prays is awarded.

Writ Granted.

8. This is the type of "built-in restraint" we approved of in *Winkler* where we stated that: "... in the case of a service contract or lease arrangement[,] [t]here, the revenue source is the rental payments or the amounts paid under the service contract. These amounts are ultimately controlled by the cost of the building which will determine the total value of bonds to be issued. The cost of the proposed building, in turn, will be governed by economic and market considerations which limit the cost of the project and the total value of the bonds issued." *Winkler, supra,* 189 W.Va. at 758, 434 S.E.2d at 430.