460 S.E.2d 727

**COUNTY COMMISSION OF BOONE COUNTY, Plaintiff Below, Appellee,**

v.

**Lee O. HILL, Trustee; Jerry W. Cook; Mid American National Bank & Trust Company, Trustee; Haddad & Associates II; Boone County Building Commission; Americare Corporation; Boone County Health Care Corporation; and Care Enterprises, Incorporated, Defendants Below, Appellants.**

No. 22725.

Supreme Court of Appeals of West Virginia.

Submitted May 30, 1995.

Decided July 13, 1995.

WORKMAN, Justice:

This matter is before the Court upon the appeal of Lee O. Hill, Trustee, Jerry W. Cook, Mid American National Bank & Trust Company ("Mid American"), Trustee, and Haddad & Associates II ("Haddad"), from the August 17, 1994 order of the Circuit Court of Boone County. The Appellants assert that the circuit court erroneously granted the County Commission of Boone County's ("county commission's") motion for summary judgment and denied the Appellants' cross motion for summary judgment. After careful consideration of the briefs, oral argument, and all other matters of record, we agree. Accordingly, we hereby reverse the circuit court's determination.

## I.

In the late 1970's, the county commission determined that it would be both desirable and in the public interest to construct a long-term care nursing home facility in Boone County. In pursuit of that aim, the county commission conveyed a 5.217 acre parcel of land to the Boone County Building Commission ("building commission") on October 22, 1979. The two commissions agreed that the fair market value of the conveyed property amounted to $33,000.

The deed for the conveyed property stated that the parcel of land was to be used "for the purpose of constructing thereon or causing to be constructed thereon a long-term extended care health facility[.]" To assure the achievement of this purpose, the deed also contained the following reverter and subordination clauses:

> The sale of the aforesaid lands to the ... [building commission] is for the express purpose of causing to be constructed thereon an extended health care facility and for that purpose only.... [S]hould the said property ever cease to be used for that purpose, the title to the aforesaid real property shall revert back to the ... [county commission] without the necessity of any legal proceeding whatsoever.

> The ... [county commission] agrees that the aforesaid right of reversion shall be and is hereby subordinated to any issuance and sale of revenue bonds as provided for

Dennis R. Vaughan, Jr., Vaughan & Withrow, Charleston, for appellee.

Francis L. Warder, Jr., Waters, Warner & Harris, Clarksburg, for Americare, Boone County Health Care Corp., and Care Enterprises, Inc.

Charles R. McElwee, Robinson & McElwee, Charleston, William E. Hamb, Hamb & Poffenbarger, Charleston, Michael J. Farrell, Jenkins, Fenstermaker, Krieger, Kayes, Farrell & Agee, Huntington, for appellants.

K. Paul Davis, John H. Tinney, Mark A. Sadd, Spilman, Thomas & Battle, Charleston, for amicus curiae Alston & Bird.

in Chapter 8, Article 33, Section 4(j) of the West Virginia Code, as amended, by the . . . [building commission]. It is the purpose of this provision to permit the use of this property as as [sic] security for the payment of any of said bonds free and acquit of the right of reversion reserved to the . . . [county commission] herein.

In 1981, the building commission issued $2.9 million in bonds which were used to construct and equip a 120 bed long-term care nursing home on the conveyed property. The bonds were apparently secured by a first lien upon the conveyed land, the nursing home, and its contents. The county commission asserts that these bonds were issued pursuant to West Virginia Code § 8–33–4(j) (1990).[1] The facility appears to have immediately commenced operations upon its completion.

In 1986, the building commission learned that it could obtain a sharp reduction in the debt service on the 1981 bonds by issuing "refunding bonds" to pay off the 1981 issuance. Accordingly, on August 25, 1986, the building commission adopted a resolution approving the issuance of approximately $2.8 million in refunding bonds to defease the 1981 issuance and release the trust indenture that held the property and its improvements as security for the 1981 bonds. Like its 1981 counterpart, the 1986 building commission resolution stated that the bonds were being issued pursuant to West Virginia Code § 8–33. Further, a new trust indenture dated August 1, 1986, secured the refunding bonds, like their predecessors, by a first lien upon the property and its improvements. The bonds were then purchased by Dean Witter Reynolds, Incorporated, and appear to have been traded in the financial markets.

On October 26, 1989, the nursing home appears to have ceased operations due to a work stoppage by its employees. As a result of the labor unrest, all of the facility's residents were immediately removed from the home, many even leaving behind some of their personal effects. The facility remained unoccupied for approximately two years thereafter. The Appellee has pointed us to three letters that it asserts make "crystal clear" that the facility had ceased being operated, and thus was abandoned, as a nursing home at this time.[2] The first letter is from counsel for the operator of the nursing home to, inter alia, the county commission. The Appellee points to language in the letter which states that the operator "will close and cease operating its Nursing Home in Danville, West Virginia effective December 31, 1989." The letter also states, however, that "[t]he facility is temporarily closed down due to extensive violence occurring at" the facility as a result of the work stoppage.

The second letter, dated March 9, 1990, is from the nursing home operator to the building commission chairman. That letter indicates that the operator no longer intends to provide security or insurance for the facility and that the building commission or the county commission should undertake that responsibility and assume physical custody of

1. Section 8–33–4(j) provides that building commissions have plenary power and authority to:

> (j) Raise funds by the issuance and sale of revenue bonds in the manner provided by the applicable provisions of sections seven, ten, twelve and sixteen [§§ 8–16–7, 8–16–10, 8–16–12 and 8–16–16], article sixteen of this chapter, without regard to the extent provided in section five [§ 8–33–5] of this article, to the limitations specified in said section twelve [§ 8–16–12], article sixteen, it being hereby expressly provided that for the purpose of the issuance and sale of revenue bonds, each commission is a 'governing body' as that term is used in said article sixteen [§ 8–16–1 et seq.] only. . . .

W.Va.Code § 8–33–4(j). On the date that this case was submitted for decision, the county com-

mission filed a resolution with the Court that was passed by the building commission on March 26, 1981. The resolution apparently formed the basis for the 1981 issuance. While the county commission has represented that the 1981 issuance proceeded according to West Virginia Code § 8–33–4(j), the resolution states that the 1981 issuance was authorized under West Virginia Code § 8–33, without specifying the precise section and subsection which permitted the issuance.

2. We would note that the parties presented virtually no evidence with their cross motions for summary judgment concerning the status of the facility following its closure. The issue does not appear to have been substantially developed until post-judgment motions were filed by the Appellants.

the premises.[3] The letter also points out, however, that the building commission chairman was "quoted in numerous newspaper articles as saying that there are numerous companies interested in purchasing or operating the facility...."

The third letter is from a Ms. Rita Susanne Bryant to the Health Care Cost Review Authority ("HCCRA") dated April 19, 1991. Ms. Bryant is a former Boone county commissioner and employee of Haddad. She apparently wrote the letter in order to seek the HCCRA's consideration of "reinstating, or granting an extention [sic] of (whichever is appropriate), the previous *"Certificate of Need"* as is necessary for the operation of the facility as a nursing home...."[4] The Appellee points to language in the letter which indicates that the facility was abandoned. The letter also notes, however, that the county maintained the utilities, insurance and security at the facility for some time "in anticipation of re-opening the facility."

In response to these materials, the Appellants point to information that they filed with their post-judgment motions. For instance, Ms. Bryant filed an affidavit on behalf of the Appellants which stated that "[f]rom 1982 until the present the Nursing Home Facility has been used only for the operation of an extended health care facility and for no other purposes." Mr. Haddad similarly opined in his supplemental affidavit, averring that subsequent to the acquisition of the property, "it has continuously been operated as an extended health care facility."

On June 18, 1991, the county commission learned that Mid American, as trustee, had issued a notice of acceleration due to the default in payment of the refunding bonds. Just prior to this notice of foreclosure, Haddad had acquired all of the refunding bonds for value on the market.

Upon learning of the acceleration and the possibility of foreclosure, the county commission and the building commission rightly became concerned. It appears that the two entities, both prior to the notice of foreclosure and thereafter, began to actively pursue Mr. Haddad to purchase the property and reopen the nursing home. For instance, a local newspaper quoted the building commission chairman, Nobert Miller, as saying " 'I called his office and asked him to consider the purchase[.]' " Janet Yeager, *Haddad New Owner of Nursing Home Bonds*, Hometown News, June 5, 1991, at 1. In relation to the county commission's efforts to lure Mr. Haddad to act, reference is made to the above-mentioned letter that body sent to the HCCRA.

On August 14, 1991, Appellant Lee O. Hill, as co-trustee, held a foreclosure sale and conveyed the property to Haddad under the trust indenture for $500,000. Prior to placing an operator in possession of the property, however, Haddad expended an additional $208,000 in making necessary repairs and maintenance to the property. Further, Boone County appears to have levied and collected thousands of dollars in taxes on the property from Haddad.

**3.** This assumption of custody appears to have occurred sometime later. According to the record, the county commission (1) took over payments for the utilities at the home; (2) included the home in the county's insurance policy; and (3) provided for security at the facility.

**4.** Even though the facility closed and was in a state of disrepair at the time of Ms. Bryant's letter, the HCCRA determined on May 10, 1991, that the nursing home was nevertheless "an existing health care facility." The county commission obviously supported this decision. In an April 29, 1991 letter, the county commission told the HCCRA that it "fully and wholeheartedly support[ed]" Ms. Bryant's request. The county commission touted the facility as "a beautiful, modern, 120–bed nursing home ... that has

been hailed by all who have toured its premises as a state-of-the-art facility, one of the best in the State." The county commission also admitted that from 1989 to 1991, it had "made every effort to keep the building secure, insured, maintained, and operational in hopes that the problems could be ironed out and the facility could be re-opened." Along the same lines, the letter states that "the Nursing Home did and will provide a much-needed service to Boone County and Southern West Virginia." Most significantly, however, the county commission appears to have taken the position in this letter that the reverter clause had not yet come into play: "It is located on land owned by the County and leased with a reverter clause providing that it must be used as a Nursing Home."

Even though it appears to have stood silent about the 1986 issuance and the interpretation of the reverter clause throughout the events discussed above, the county commission took the curious step of filing the instant declaratory judgment action just prior to the foreclosure sale. The county commission essentially sought two elements of relief: (1) a determination that the bonds were void; and (2) a declaration that since the nursing home was no longer in operation, title was vested in the county commission under the reverter clause. Thereafter, the parties filed cross motions for summary judgment. On August 17, 1994, the circuit court granted the Appellee's motion and denied the Appellants' motion.

In a nutshell, the circuit court reasoned that (1) the refunding bonds were void because they were not issued pursuant to, or in accordance with, either constitutional or statutory authority; (2) the trust indenture was not a valid encumbrance on the property because the building commission was not authorized by statute to secure the bonds in that fashion; (3) the property reverted to the county commission in October 1989 when it ceased operations as a nursing home; and (4) the subordination clause was not triggered because the refunding bonds were not issued pursuant to West Virginia Code § 8–33–4(j).[5]

The Appellants filed post-judgment motions under both West Virginia Rules of Civil Procedure 59(e) and 60(b)(1), (2) and (6). These motions were ultimately denied. The Appellants filed a petition for appeal on December 22, 1994, which we granted on February 2, 1995. During the pendency of this appeal, we received an amicus curiae brief on behalf of the law firm of Alston & Bird. That firm, which acted as bond counsel for the refunding bonds, states that the bonds were issued pursuant to West Virginia Code § 8–33–4(i).

While the parties have discussed numerous ancillary issues, we think this case can be distilled to essentially two questions. First, we must determine whether the building commission possessed statutory authority to

issue the refunding bonds and encumber the property as security for such. Second, we must ascertain whether the reverter clause was implicated either by (1) the failure to satisfy the subordination provision; or (2) the cessation of operations at the nursing home. For the reasons that follow, we conclude that the circuit court erred in its disposition of this matter. Accordingly, we now reverse.

## II.

### A. The Building Commission's Authority to Issue the Refunding Bonds and Encumber the Property

While we are aware of the parties' differing conceptions and confusion about which statute authorized the issuance of the refunding bonds, we place great weight on bond counsel's representation that the issuance was undertaken pursuant to § 8–33–4(i). Accordingly, we must determine whether the building commission was authorized to issue the refunding bonds and encumber the property under that subsection or a related one.

West Virginia Code § 8–33 speaks directly to the organization and powers of building commissions. The powers with which a building commission is ordained are set forth in West Virginia Code § 8–33–4. That section provides, in pertinent part, as follows:

Each commission shall have *plenary power and authority* to:

. . . .

(h) Sell, *encumber* or dispose of *any property, real or personal;*

(i) *Issue negotiable bonds,* notes, debentures *or other evidences of indebtedness* and provide for the rights of the holders thereof, *incur any proper indebtedness* and issue any obligations and *give any security therefor which it may deem necessary or advisable in connection with exercising powers as provided herein;*

. . . .

---

**5.** Indeed, there appeared to be quite a bit of confusion below as to the particular statute that was utilized in issuing the refunding bonds. As

will become apparent, that confusion has now been resolved.

(m) Do all things reasonable and necessary to carry out the foregoing powers.

*Id.* (emphasis added).

To the extent that one might harbor any doubts, West Virginia Code § 8–33–12 (1990) provides that all of article 33 is remedial in nature, and thus entitled to a liberal construction. Further, we have previously construed the phrase "plenary power and authority" to mean " '[a]uthority and power as broad as is required in a given case.' " *Ellison v. City of Parkersburg*, 168 W.Va. 468, 472, 284 S.E.2d 903, 906 (1981) (quoting *Black's Law Dictionary* 1039 (5th ed. 1979)).

▮ The Appellant argues that since refunding bonds are not expressly authorized by § 8–33–4(i), such bonds may not be issued by building commissions. We disagree for at least three reasons. First, the text of § 8–33–4(i) clearly allows for the incurrence of "other evidences of indebtedness" beyond the stated "bonds, notes, [and] debentures." *Id.* Second, the legislative grant of power is so immense that one could not reasonably argue that the authority to issue refunding bonds is not implied in § 8–33–4(i). *See* W.Va.Code § 8–1–7 (1990) ("The enumeration of powers and authority granted in this chapter shall not operate to exclude the exercise of other powers and authority fairly incidental thereto or reasonably implied and within the purposes of this chapter.") Third, we have noted on several occasions that there is little, if any, practical difference between bonds of original issuance and refunding bonds. *See, e.g., Winkler v. West Virginia School Bldg. Auth.*, 189 W.Va. 748, 434 S.E.2d 420 (1993) [6]; *Board of Educ. v. Slack*, 174 W.Va. 437, 327 S.E.2d 416 (1985). Given these principles, as well as the liberal interpretation that we must accord § 8–33–4(i), we have little difficulty in concluding that the refunding bonds

were issued pursuant to and in compliance with statutory authority.[7]

Our general conclusion that § 8–33–4(i) grants broad authority in the realm of bond issuances is not particularly novel. We recognized the same proposition just two terms ago. In *State ex rel. Clarksburg Mun. Bldg. Comm'n v. Spelsberg*, 191 W.Va. 553, 447 S.E.2d 16 (1994), a case which none of the parties have cited, we stated as follows:

> The [building] Commission is also authorized to dispose of or lease its property for public purposes, *and to issue negotiable bonds, notes, debentures, or other evidences of indebtedness and provide for the rights of the holders thereof, incur any proper indebtedness and issue any obligations and give any security therefor which it may deem necessary or advisable in connection with exercising its powers.* W.Va.Code 8–33–4(1), *(i)* [1968].

191 W.Va. at 555, 447 S.E.2d at 18 (emphasis added).[8]

▮ We further conclude that § 8–33–4(h) authorized the building commission to encumber the property via the trust indenture. The statutory language admits of no other interpretation. *See also* W.Va.Code § 8–33–4(i) (stating that a building commission may "incur any proper indebtedness and issue any obligations *and give any security therefor which it may deem necessary or advisable* ") (emphasis added). Accordingly, we conclude that the refunding bonds are valid and that the facility was properly encumbered by the trust indenture.

### B. The Subordination and Reverter Clauses

#### 1. The Subordination Clause

▮ Given our conclusion that the refunding bonds were properly issued pursuant to

---

6. We also recognized in *Winkler* the salutary purpose that often underlies an entity's decision to refund previously issued bonds. *Id.,* 189 W.Va. at 765, 434 S.E.2d at 437 (stating that the refunding of a previous issuance is designed "to enable the bond issuing authority to obtain the advantage of lower interest rates through the use of refunding bonds. Refunding the bonds saves on the cost of liquidating the older bonds").

7. Having reached this conclusion, however, we think the better approach for prudent bond counsel would be to utilize § 8–33–4(j), which provides a bit more guidance on procedures for notice and public comment. In fact, we would encourage the legislature to consider the consolidation of subsections (i) and (j).

8. Interestingly enough, no mention was made in *Spelsberg* of § 8–33–4(j).

§ 8–33–4(i), one might immediately conclude that the subordination provision is not satisfied. Indeed, the clause states in pertinent part that "the ... right of reversion shall be and is hereby subordinated to any issuance and sale of revenue bonds as provided for in Chapter 8, Article 33, *Section 4(j)* of the West Virginia Code." (Emphasis added). This language, however, cannot be read in isolation.

One must also take note of the subordination provision's second sentence: "It is the purpose of this provision to permit the use of this property as as [sic] security for the payment of any of said bonds free and acquit of the right of reversion reserved to the ... [county commission] herein." This language indicates (1) that whether the refunding bonds were issued pursuant to subsection 4(j) or 4(i) is largely a matter of semantics, and (2) that the citation of subsection 4(j) is merely surplusage. The subordination clause is in the deed for one reason: the county commission wanted to assure that the property could be used as security for a bond issuance that would aid in financing the much-needed facility. The refunding bonds satisfied this desire and went no further. That this purpose was accomplished under one subsection rather than another in the same statute is of no moment. Accordingly, we hold that the § 8–33–4(i) issuance satisfied the subordination provision.

### 2. The Reverter Clause

The only remaining question is whether the reverter clause was triggered by the building commission's lapse in using the property as a nursing home for approximately two years. It is worth restating the language of the clause:

The sale of the aforesaid lands to the ... [building commission] is for the express purpose of causing to be constructed thereon an extended health care facility and for that purpose only.... *[S]hould the said property ever cease to be used for that purpose,* the title to the aforesaid real property shall revert back to the ...

County Commission ... without the necessity of any legal proceeding whatsoever. (Emphasis added).

We recently stated in syllabus point two of *Williams v. Precision Coil, Inc.,* 194 W.Va. 52, 459 S.E.2d 329 (1995), as follows:

Summary judgment is appropriate if, from the totality of the evidence presented, the record could not lead a rational trier of fact to find for the nonmoving party, such as where the nonmoving party has failed to make a sufficient showing on an essential element of the case that it has the burden to prove.

*Id.* at 56, 459 S.E.2d at 333.

In interpreting the reverter clause in light of the record herein, we find our decision in *Marthens v. B & O R.R. Co.,* 170 W.Va. 33, 289 S.E.2d 706 (1982) helpful by analogy. In *Marthens,* we dealt with a provision in a deed which stated that the land was to revert to the grantor " 'at any time when said railroad company shall cease to use it solely and strictly for railroad purposes.' " *Id.* at 36, 289 S.E.2d at 709. The grantee railroad subsequently leased portions of the property to entities which did not utilize the property for the stated purpose. *Id.* at 36, 289 S.E.2d at 709. We stated as follows in *Marthens:*

[T]here are three broad criteria to which a court must look to determine whether land is no longer being used for railroad purposes: (1) has the property actually been alienated by sale or lease or effectively abandoned by long nonuser; (2) if the property is leased or unused, would a reasonable person conclude that there is a substantial likelihood that the property will be used again for railroad purposes; and (3) if part of the property is no longer used for railroad purposes and has been abandoned under the two criteria above, and part is still used for railroad purposes, is the unused property sufficiently distinct and identifiable that it can be separated in some reasonable way from property that is still being used for railroad purposes.

*Id.* at 36–37, 289 S.E.2d at 710.

While the third factor has little or no relevance to the instant case, the two criteria

for abandonment do. We must determine whether the property in question was ever abandoned, i.e. "cease[d] to be used," as an extended health care facility. Drawing on the two *Marthens* elements above, and with reference to the facts of the instant case, we think this question is resolved by determining whether the property was permanently abandoned for the stated purpose or, to the contrary, whether a reasonable person would conclude that there was a substantial likelihood that the property would again be used for the stated purpose in due course. In making this determination, we must look to the grantee's intentions, "as evidenced by their long-range plans for the particular property, the economic conditions giving rise to the ... non-use, and the length of the non-use." *Id.* at 39, 289 S.E.2d at 712.[9]

■ There is no substantial indication in the record which tends to demonstrate that the long range plans for the property entailed anything other than reopening the facility as a nursing home. Indeed, this was the only prudent course to take. As stated by the county commission itself as late as April 29, 1991, to the HCCRA: "[The facility] *is* a beautiful, modern, 120-bed nursing home facility that has been hailed by all who have toured its premises as a state-of-the-art facility, one of the best in the State." (Emphasis added). The county commission further stated that it felt that "the Nursing Home did *and will* provide a much-needed service to Boone County and Southern West Virginia[.]" (Emphasis added). We are not directed to anything in the record which would tend to indicate that the building commission was in anything less than full agreement with these statements.

As for the second factor, the economic conditions giving rise to the non-use are not vigorously disputed. The reason for closure had nothing to do with the profitability or need for the facility. In fact, the county commission stated in its letter to the HCCRA that "[t]he closure was in no way due to a lack of need." The county commis-

sion also touted the economically beneficial effects of the facility and the fact that at the time of the closure, "[t]he Nursing Home enjoyed approximately 98% occupancy[.]" The only reason for the lapse in use of the facility was the labor dispute discussed above. Few would contend that the building commission had any control over or ability to prevent the lapse. Labor disputes and their accompanying consequences are no longer an extraordinary occurrence in the service industry. It does not stand to reason that such an event, if resolved in due course, should work a forfeiture of property from a grantee that has endeavored mightily to abide by a deed's stated purpose.

Neither do we find the length of non-use to be particularly troublesome. Once the labor dispute was resolved, the facility reopened its doors. In making this determination, we are not unmindful of the HCCRA's finding that even after the lapse in operations, the nursing home still constituted "an existing health care facility[.]"

■ While it is beyond cavil that the nursing home closed in 1989 due to the labor dispute, *Marthens* and a legion of authority provide that "nonuser alone, without further inquiry, is not dispositive of the abandonment issue." *Id.* at 37, 289 S.E.2d at 710. To the extent that we did not explicitly adopt this position in *Marthens,* we now categorically hold that mere nonuse alone, without further inquiry, is not dispositive of whether a grantee has sufficiently abandoned property so as to trigger a reverter clause contained in the grantee's deed.

Based on the above factors, and our reading of the record as a whole, the only reasonable conclusion to be drawn from the evidence herein is that there was not only a substantial likelihood, but rather a near certainty, that the nursing home would be revived in due course. Indeed, that likelihood was realized when Haddad foreclosed on the property and resolved the labor dispute. In fact, to this day the facility is still operating in accordance with the stated purpose in the

9. We formulated these elements anticipating that they would typically raise a jury question. *Marthens,* 170 W.Va. at 38, 289 S.E.2d at 712. Nevertheless, as will become apparent below, we

conclude that the Appellants have satisfied West Virginia Rule of Civil Procedure 56 and are thus entitled to summary judgment.

deed. In sum, we conclude that in light of the *Marthens* factors, the subject property never ceased to be used for the stated purpose as a matter of law. Accordingly, the reverter clause was not triggered.

### III.

For the reasons set forth above, we conclude (1) that the refunding bonds were validly issued; (2) that the facility was properly encumbered; (3) that the subordination provision was satisfied; and (4) that the reverter clause was not triggered. Accordingly, we hereby reverse the judgment of the circuit court and direct that judgment be entered for the Appellants consistent with this opinion.[10]

Reversed and remanded with directions.

BROTHERTON, J., did not participate.

FOX, Judge, sitting by temporary assignment.

---

**10.** While we have carefully considered the parties' remaining arguments, we conclude that they are not meritorious.