479 S.E.2d 695

STATE of West Virginia ex rel. the CHARLESTON BUILDING COMMISSION, a Public Corporation, Relator,

v.

Walter B. DIAL, Jr., Chairman Pro Tem of the Charleston Building Commission, a Public Corporation, Respondent.

No. 23582.

Supreme Court of Appeals of West Virginia.

Submitted Oct. 1, 1996.

Decided Dec. 11, 1996.

James K. Brown, Jackson & Kelly, Charleston, for Relator.

Robert E. Douglas, Charleston, George M. Scott, Spencer, for Respondent.

John R. Hoblitzell, Kay, Casto, Chaney, Love & Wise, Charleston, for Amici Curiae R. Brawley Tracy, R. Thomas Linger, and Betty Linger, d/b/a The Morrison Building.

CLECKLEY, Justice:

In this original mandamus proceeding, the relator, the Charleston Building Commission, challenges its authority to acquire property,

issue bonds to finance the acquisition, and lease the acquired property to the State of West Virginia pursuant to a lease-purchase agreement. The Charleston Building Commission contends that such actions neither exceed the statutory authority of a municipal building commission granted by W. Va.Code, 8-33-1 *et seq.*, nor violate Article X, Sections 4, 6, or 8, of the West Virginia Constitution. We issued a rule to show cause and now grant the writ of mandamus.[1]

## I.

## FACTUAL AND PROCEDURAL HISTORY

The relator in this case, the Charleston Building Commission [hereinafter Commission], is a public corporation of the State of West Virginia created by the City of Charleston as a municipal building commission pursuant to W. Va.Code, 8-33-1 (1975).[2] The West Virginia Department of Health and Human Resources [hereinafter DHHR], which has many divisions situated in various office buildings throughout the City of Charleston, informed the Commission that the State of West Virginia [hereinafter State] desired to lease-purchase a large office building, in Charleston, so that the DHHR could consolidate all of its divisions within one structure.[3] Upon a review of the available office space in Charleston, the DHHR determined that the only existing building that would permit its consolidation was the building that formerly housed the Diamond department store [hereinafter Diamond building]. In the alternative, a proposed, newly-constructed building would also satisfy the DHHR's needs.

The Diamond building being the only building presently available in the City of

---

**1.** The Honorable Arthur M. Recht resigned as Justice of the Supreme Court of Appeals of West Virginia effective October 15, 1996. The Honorable Gaston Caperton, Governor of the State of West Virginia, appointed him Judge of the First Judicial Circuit on that same date. Pursuant to an administrative order entered by this Court on October 15, 1996, Judge Recht was assigned to sit as a member of the Supreme Court of Appeals of West Virginia commencing October 15, 1996, and continuing until further order of this Court.

**2.** W. Va.Code, 8-33-1 (1975), authorizes "[a]ny municipality ... [to] create and establish a municipal building commission[.]" The powers of a municipal building commission, as they pertain to the instant case, are enumerated in W. Va. Code, 8-33-4 (1984):

"Each commission shall have plenary power and authority to:

\* \* \* \* \* \*

"(f)(1) Acquire, purchase, own and hold any property, real or personal, and (2) acquire, construct, equip, maintain and operate public buildings, structures, projects and appurtenant facilities, of any type or types for which the governmental body or bodies creating such commission are permitted by law to expend public funds (all hereinafter in this article referred to as facilities);

\* \* \* \* \* \*

"(h) Sell, encumber or dispose of any property, real or personal;

"(i) Issue negotiable bonds, notes, debentures or other evidences of indebtedness and provide for the rights of the holders thereof, incur any proper indebtedness and issue any obligations and give any security therefor which it may deem necessary or advisable in connection with exercising powers as provided herein;

"(j) Raise funds by the issuance and sale of revenue bonds in the manner provided by the applicable provisions of sections seven, ten, twelve and sixteen [§§ 8-16-7, 8-16-10, 8-16-12 and 8-16-16], article sixteen of this chapter, without regard to the extent provided in section five [§ 8-33-5] of this article, to the limitations specified in said section twelve [§ 8-16-12], article sixteen, it being hereby expressly provided that for the purpose of the issuance and sale of revenue bonds, each commission is a 'governing body' as that term is used in said article sixteen [§ 8-16-1 et seq.] only;

\* \* \* \* \* \*

"(*l*) Lease its property or any part thereof, for public purposes, to such persons and upon such terms as the commission deems proper, but when any municipality or county commission is a lessee under any such lease, such lease must contain a provision granting to such municipality or county commission the option to terminate such lease during any fiscal year covered thereby; and

"(m) Do all things reasonable and necessary to carry out the foregoing powers."

Upon creation of the Charleston Building Commission, the City Council of the City of Charleston, West Virginia, incorporated the above listed powers in the "Bill creating a municipal building commission for the City of Charleston and providing for the exercise of certain powers by such building commission."

**3.** The DHHR advised the Commission that the State would be interested in lease-purchasing either a new structure or a renovated, pre-existing building.

Charleston large enough to permit reorganization of the DHHR, the State and Arbor Oaks Ventures, Inc. [hereinafter Arbor Oaks], the current owner of the Diamond Building, requested the Commission to acquire and renovate this structure. The proposed venture would require the Commission to purchase and refurbish the Diamond building and to finance this project by issuing bonds or certificates of participation. The State, in turn, would enter a lease-purchase agreement with the Commission whereby the State would pay rent to the Commission, for the use of the renovated office building, in an amount sufficient to discharge the bonds or certificates of participation. Upon repayment of the bonds, or other such obligations, the State would have the option to purchase the building from the Commission.[4]

On September 20, 1995, the Commission adopted a resolution to proceed with this project. Subsequently, the State, through its purchasing division, sought competitive proposals to provide an office building, with associated parking accommodations, sufficient to permit the DHHR to consolidate its scattered divisions. Arbor Oaks responded with a bid to sell and develop, with the Commission's assistance, the Diamond building. On April 8, 1996, the purchasing division of the State Department of Administration awarded the contract to Arbor Oaks.

During negotiations regarding the sale, purchase, and renovation of the Diamond building, Arbor Oaks suggested to the Commission that professional financial advisory services would be prudent in order to establish the terms of the financial backing needed to finance the purchase and the agreement whereby the State's rental payments would be used to discharge these obligations. Accordingly, Arbor Oaks contacted Millennium Capital Markets LLC [hereinafter Millennium], who in turn prepared a letter outlining the financial services it would provide in this venture. Millennium proposed that it would serve as "financial advisor" to both Arbor Oaks and the Commission with regard to the preparation of the lease-purchase agreement between the Commission and the State; the establishment of a grantor trust, which would facilitate financing the project; and the sale of tax-exempt pass-through certificates, to be secured by a first mortgage lien on, and security interest in, the property and rental income generated by the property under the lease-purchase agreement.[5]

By resolution dated May 16, 1996, the Commission agreed to accept the financial advisory services offered by Millennium and authorized and directed its Chairman *Pro Tem*,[6] respondent Walter B. Dial, Jr., to execute a Financial Advisor Agreement on behalf of the Commission as acceptance of Millennium's services. In response to this resolution, respondent Dial refused to execute the financial agreement until the Commission's authority to enter a lease-purchase agreement with the State and to issue bonds to finance this project has been approved by the Supreme Court of Appeals of

---

4. Although the record does not contain the proposed lease-purchase agreement, it appears that the State would have the option to terminate the lease after giving the Commission thirty days' notice. It is not clear from the record whether the State's option to terminate the agreement would be available only after all of the bonds or certificates had been repaid or whether the State could terminate the lease at any time in its capacity as lessee.

5. In its letter to Arbor Oaks and the Commission, Millennium conditioned its decision to provide financial advisor services as follows:

"In conjunction with our engagement, we will rely upon the opinion of the counsel to the City of Charleston Building Commission (the "Commission") as to the legality of this proposed structure within the context of the laws of the United States of America, the State of West Virginia and any jurisdictions thereof which may be relevant. In addition, we will rely on certain representations, of the Commission and its counsel, as to its authority to enter and effect such transaction or any agreement necessitated thereby."

6. Generally, the Commission's bylaws permit the Chairman to execute contracts and agreements on behalf of the Commission "when and if directed by the members of the Commission." In the Chairman's absence, the Vice–Chairman has the power to execute contracts and agreements. In the instant case, both the Chairman and the Vice–Chairman recused themselves with regard to the acquisition of the Diamond building and the ensuing lease-purchase agreement with the State. Therefore, respondent Dial was appointed Chairman *Pro Tem* with respect to this matter.

West Virginia.[7] As a result, the Commission adopted a resolution authorizing the filing of this petition for a peremptory writ of mandamus requesting this Court to compel respondent Dial to execute the Financial Advisor Agreement on behalf of the Commission.[8]

## II.

### DISCUSSION

Before this Court, the relator Commission maintains that it has the power and authority to proceed with the above-described venture. In response to respondent Dial's letter, in which he requested this Court to clarify the Commission's authority to engage in the proposed project, the Commission requests this Court to define (1) the authority of the Commission to acquire and renovate a building and to lease this building to the State pursuant to a lease-purchase agreement and (2) the authority of the Commission to issue revenue bonds or certificates of participation

to finance the acquisition and renovation of a building to be leased in accordance with a lease-purchase agreement.[9] After a brief discussion of the standard for issuing a writ of mandamus, we will address the issues raised by the Commission.[10]

### A.

### *Standard for Issuing Writ of Mandamus*

Before we address the merits of the relator's petition, we must first determine whether mandamus is an appropriate remedy in the instant case. The Commission represents that it has a clear legal right to have respondent Dial execute the Financial Advisor Agreement on its behalf. Moreover, the Commission states that it has no other adequate remedy in this case other than that requested from this Court. Although respondent Dial does not address whether the Commission has satisfied the requirements for a writ of mandamus to issue, Amici Curiae assert that the Commission has failed to

---

**7.** In his letter to the Commission, respondent Dial stated:

"I am unwilling to execute the Financial Advisor Agreement in behalf of the Commission unless and until the Supreme Court of Appeals of the State of West Virginia shall have rendered a decision satisfactory to counsel for the Commission and Bond counsel for the Commission that:

"1. The Commission has the power and authority under applicable law to acquire and renovate or construct a building in the city of Charleston for occupancy and use for office purposes by officials and employees of the State of West Virginia under a lease-purchase agreement with the State, as lessee (the "Project"); and

"2. The Commission has the power and authority under applicable law to issue revenue bonds or, through a trustee, certificates of participation, to finance such a Project, with the source of, and security for, repayment of such financial obligations being solely the agreed rentals from the state [*sic*] and the encumbrance of the Project; and

"3. No other provisions of applicable law which are raised by any potential bond counsel, or counsel for the Commission or otherwise, preclude the Commission from acquiring and financing such a Project and leasing it to the State with an option for the State to purchase the Project by full payment of the rentals required for satisfaction in full of such bonds or certificates of participation."

**8.** The record suggests that Arbor Oaks agreed to pay the legal fees of both the Commission and

respondent Dial in order to permit this Court to determine the Commission's authority to undertake the proposed endeavor.

**9.** We decline to address those concerns raised by the Commission that do not bear directly upon its present authority to engage in the proposed property acquisition and lease-purchase. More specifically, we decline to rule upon the following issues purportedly raised by the Commission in anticipation of future litigation: (1) exemptions from taxation governed by West Virginia Constitution Article X, Section 1; (2) satisfaction of statutory requirements for competitive bidding enumerated in W. Va.Code, 5–22–1 (1983); and (3) equal protection considerations.

**10.** Three individuals, R. Brawley Tracy, R. Thomas Linger, and Betty Linger, d/b/a The Morrison Building, moved to intervene in this action. These persons own the Morrison Building which currently leases office space to certain divisions of the DHHR. If the proposed acquisition, renovation, and lease-purchase agreement transpire, these DHHR divisions would likely vacate the Morrison Building and relocate to the renovated Diamond building. By order dated September 12, 1996, this Court denied the Motion to Intervene with leave to file a brief Amici Curiae. These individuals will hereafter be referred to collectively as Amici Curiae, and their challenges to the proposed project will be noted in relation to the respective arguments of respondent Dial.

satisfy these criteria. They contend that the record submitted for this Court to consider the project's propriety is inadequate because it does not contain any detailed information regarding the proposed financing through bonds or certificates of participation. *Citing Winkler v. State Sch. Bldg. Auth.*, 189 W.Va. 748, 434 S.E.2d 420 (1993). In this regard, Amici Curiae state that the Commission has failed to demonstrate a clear legal right to the relief which it seeks.

■ Traditionally, we have reviewed mandamus as an extraordinary remedy available only in limited and exceptional circumstances. *See, e.g., State ex rel. United States Fidelity & Guar. Co. v. Canady*, 194 W.Va. 431, 436, 460 S.E.2d 677, 682 (1995) ("[m]andamus, prohibition and injunction against judges are drastic and extraordinary remedies.... As extraordinary remedies, they are reserved for really extraordinary causes" (Citations omitted).). *See also State ex rel. Billings v. City of Point Pleasant*, 194 W.Va. 301, 303, 460 S.E.2d 436, 438 (1995) ("[s]ince mandamus is an 'extraordinary' remedy, it should be invoked sparingly" (Footnote omitted).). Consistent with this notion, "we have commonly recognized that a writ of mandamus is a proper method of testing the legality of a bond issue before the bonds are actually issued." *State ex rel. Lawrence v. Polan*, 192 W.Va. 629, 635, 453 S.E.2d 612, 618 (1994). *See also State ex rel. Marockie v. Wagoner*, 190 W.Va. 467, 469 n. 1, 438 S.E.2d 810, 812 n. 1 (1993) ("[t]his type of proceeding [mandamus] has been the traditional format for this Court to pass on the constitutionality of state bonds in advance of their issuance" (Citations omitted).). Accordingly, we find that mandamus is proper in this case because the Commission requests this Court to determine the appropriateness of the contemplated property acquisition and accompanying bond issuance.

■ Attempting to further limit the extraordinary remedy of mandamus, we have established additional guidelines which a party requesting mandamus must satisfy before we will grant such relief.

" 'A writ of mandamus will not issue unless three elements coexist—(1) a clear legal right in the petitioner to the relief sought; (2) a legal duty on the part of respondent to do the thing which the petitioner seeks to compel; and (3) the absence of another adequate remedy.' Syllabus Point 2, *State ex rel. Kucera v. City of Wheeling*, 153 W.Va. 538, 170 S.E.2d 367 (1969)." Syl. pt. 1, *State ex rel. Billings v. City of Point Pleasant, supra.*

In the instant case, we find that the Commission has satisfied the three prerequisites for a writ of mandamus to issue. First, the Commission has a legal right to compel respondent Dial to execute the Financial Advisor Agreement on its behalf. In this regard, we note our prior decisions in which we have held that " '[m]andamus lies to require the discharge by a public officer of a nondiscretionary duty.' Syllabus point 3, *State ex rel. Greenbrier County Airport Authority v. Hanna*, 151 W.Va. 479, 153 S.E.2d 284 (1967)." Syl. pt. 6, *State ex rel. Kanawha County Bldg. Comm'n v. Paterno*, 160 W.Va. 195, 233 S.E.2d 332 (1977). *See also State ex rel. Council of City of Charleston v. Hall*, 190 W.Va. 665, 671, 441 S.E.2d 386, 392 (1994) ("public officers, or boards of officers, may maintain proceedings in mandamus to compel other officers to perform ministerial acts ... which are necessary to be performed in order to enable such officer or board to perform its own duties" (Citation omitted).).

Here, the Commission's bylaws specifically direct that the Commission's Chairman *"shall* execute ... contracts, notes, bonds, agreements or other papers necessary, requisite, proper or convenient to be executed by or on behalf of the Commission when and if directed by the members of the Commission." (Emphasis added). Thus, respondent Dial, as the acting Chairman, is required to execute agreements if the Commission requests him to do so. In the current case, the Commission apparently requested respondent Dial to execute the Financial Advisor Agreement as a necessary prerequisite to issuing bonds and acquiring property to be subsequently leased to the State. Because respondent Dial has a nondiscretionary duty to comply with the Commission's request, we conclude that the Commission has a clear legal right to compel respondent Dial to execute the above-described agreement.

■ At this point, we note respondent Dial's argument that he has no authority to execute the Financial Advisor Agreement on behalf of the Commission because the Commission's bylaws do not include among the enumerated officers the position of Chairman *Pro Tem.* Although respondent Dial is acting as Chairman *Pro Tem* of the Commission, rather than as the Commission's duly elected Chairman, we find this variation in terminology to be a distinction without a difference. As the Commission correctly notes, W. Va. Code, 8–33–4 (1984), specifically authorizes a municipal corporation to:

"(d) Make and adopt all necessary, appropriate and lawful bylaws and rules and regulations pertaining to its affairs;

"(e) Elect such officers [and] appoint such ... agents ... as may be necessary for the conduct of the affairs and operations of the commission;

\* \* \* \* \* \*

"(m) Do all things reasonable and necessary to carry out the foregoing powers."

With regard to the Diamond building project, the Commission contends that it had no choice but to appoint respondent Dial as Chairman *Pro Tem* because both the Chairman and the Vice–Chairman had recused themselves from participating in this matter. Under these circumstances, we agree with the Commission's assertion that it exercised its power to do those things necessary, including appointment of a Chairman *Pro Tem,* to carry out the affairs of the Commission.

The Commission also satisfies the second prerequisite for the issuance of a writ of mandamus: respondent Dial, as Chairman *Pro Tem* of the Commission, has a legal duty to execute the Financial Advisor Agreement on the Commission's behalf. As Chairman *Pro Tem,* Dial possesses all of the responsibilities and duties of the Commission's regularly elected Chairman, including the duty to act upon particular matters in accordance with the Commission's directives. Therefore, respondent Dial has a legal duty to perform that act which the Commission seeks to compel.

Finally, no other adequate remedy is available to the relator Commission in this case.

Indeed, the Commission cannot proceed with its proposed bond issuance, property acquisition, renovation, and lease-purchase agreement until it enters into the Financial Advisor Agreement with Millennium, and it cannot execute this Agreement until its representative in this matter, respondent Dial, agrees to endorse the document on the Commission's behalf. Thus, the Commission is essentially at a standstill with regard to the tentative project until we determine the rights and duties of the respective parties. Accordingly, we conclude that mandamus is an appropriate remedy in this case.

B.

*Authority of Commission to Acquire and Lease Property to State*

■ The Commission first argues that it has the authority to acquire and renovate a building and to lease this building to the State pursuant to a lease-purchase agreement. W. Va.Code, 8–33–4 (1984), grants municipal building commissions the power to:

"(f)(1) Acquire, purchase, own and hold any property, real or personal, and (2) acquire, construct, equip, maintain and operate public buildings, structures, projects and appurtenant facilities, *of any type or types for which the governmental body or bodies creating such commission are permitted by law to expend public funds* [.]" (Emphasis added).

In this regard, the Commission may expend funds for public buildings in the same manner as its creator, the City of Charleston. W. Va.Code, 8–12–5(36) (1989), provides that a municipality has the authority "[t]o establish, construct, acquire, maintain and operate public buildings, municipal buildings ... motor vehicle parking lots, or any other public works[.]" The Commission suggests that these statutes grant a municipal building commission broad power and authority to conduct the enumerated acts. *Citing* W. Va. Code, 8–33–12 (1969); *County Comm'n of Boone County v. Hill,* 194 W.Va. 481, 460 S.E.2d 727 (1995). Thus, these provisions permit the Commission to construct or acquire public buildings such as the Diamond building at issue in this case.

The Commission further tenders in support of its position this Court's prior decision in *State ex rel. Clarksburg Mun. Bldg. Comm'n v. Spelsberg*, 191 W.Va. 553, 447 S.E.2d 16 (1994). In *Spelsberg*, we upheld an agreement between the Clarksburg Municipal Building Commission and the City of Clarksburg whereby the commission would construct a new municipal building, finance the project through the issuance of bonds, and lease the completed structure to the city. As with the Commission's proposed lease-purchase agreement in the instant case, the Clarksburg venture also anticipated discharging the bond obligation with the lessee's rent payments. *See also State ex rel. West Virginia Resource Recovery—Solid Waste Disposal Auth. v. Gill*, 174 W.Va. 109, 323 S.E.2d 590 (1984), *overruled, in part, on other grounds by Winkler v. State Sch. Bldg. Auth.*, 189 W.Va. 748, 434 S.E.2d 420 (1993). Thus, the Charleston Building Commission urges this Court to uphold its proposed project because the State office building in this case is a public building substantially similar to the city municipal building of the Clarksburg enterprise.

Respondent Dial contests the Commission's authority to acquire the Diamond building and subsequently lease the renovated structure to the State under a lease-purchase agreement. He asserts that while W. Va.Code, 8–33–4(f), permits the Commission to acquire the building and lease it to the City of Charleston for city use, this code section does not indicate that the Commission may similarly obtain a building and lease it to the State of West Virginia for state purposes. Although the proposed project would be a public building, respondent Dial contends that the project proposed by the Commission is *ultra vires* because the build-

ing will ultimately benefit the State of West Virginia rather than the City of Charleston.

Consistent with respondent Dial's position, Amici Curiae assert that the City of Charleston has no authority to acquire, renovate, or construct a building designed specifically for state use. The Charter of the City of Charleston, West Virginia, provides, in part:
> *"Sec. 76. Power of council as to public buildings[.]*
>
> The council [of the City of Charleston] shall have the authority to erect, buy, sell and lease all buildings necessary for the use of the city government and to provide for and regulate the same[.]"  (Emphasis in original).

Because the City has no authority to provide a building for the State's use, W. Va.Code, 8–33–4, suggests that the Commission also cannot provide a structure solely for state purposes.[11] *See also* W. Va.Code, 8–12–1(4) (1969) (permitting municipality to purchase and acquire real property "for any municipal purpose"); W. Va.Code, 8–12–5 (1989) (enumerating general powers of municipality).[12]

In general, we agree with the Commission's contention that it possesses the authority to acquire and renovate a building to be occupied by the State and to further lease this building to the State pursuant to a lease-purchase agreement. However, we arrive at the Commission's authority to do so in a slightly different manner than the arguments set forth above. The Commission correctly establishes that a municipal building commission's authority is derived in large part from the underlying powers of the municipality by which it was created. *See* W. Va.Code, 8–12–5(36); W. Va.Code, 8–33–4(f). Accordingly, we must look to the specific capacity of the City of Charleston to acquire a building and to lease this building to the State.

---

**11.** However, Amici Curiae suggest that the Commission could, in fact, provide a building for the State if it adheres to the specific requirements found in Section 59 of the Charter of the City of Charleston, which permits the City to acquire property to be used as a State Capitol or other public buildings by the State of West Virginia.

**12.** Respondent Dial contends further that the proper governmental body to undertake the proposed project is not the Charleston Building Commission, but rather the Development Author-

ity. *Citing* W. Va.Code, 7–12–2 (1986) (listing purposes of Development Authority). Likewise, Amici Curiae contend that the State Building Commission, whose purpose is to own and operate state buildings, is a more appropriate body to acquire such property for the State than is the Charleston Building Commission. *Citing* W. Va. Code, 5–6–4 (1996). Because we are able to ascertain the scope of the Commission's authority on other grounds, we decline to address these additional statutory arguments.

W. Va.Code, 8–12–5, delineates the general powers of municipalities to include "the powers and authority granted by (i) the constitution of this state, (ii) other provisions of this chapter, (iii) other general law, and (iv) *any charter,* and[,] to the extent not inconsistent or in conflict with any of the foregoing except special legislative charters," the additional powers specified in this statutory provision. (Emphasis added). As Amici Curiae noted in their brief, the Charter of the City of Charleston permits the City, as the State's Capital, to engage in specific property transactions with the State. Specifically, Section 59 of the Charter of the City of Charleston provides, in pertinent part:

> "The City of Charleston is hereby authorized to issue and sell bonds of said city, for the ... purpose of ... acquiring or assisting in acquiring property to be donated, dedicated or conveyed to, or otherwise vested in, the State of West Virginia, as a site for a state capitol and other public buildings, which donation, dedication and conveyance are hereby authorized to be made[.]"

Therefore, the City of Charleston has the authority to acquire property for the State to use for public buildings. In the same manner, because the Charleston Building Commission derives its authority from the City which created it, the Commission also has the capacity to provide property and public buildings for the State's use. Thus, we find that the Charleston Building Commission has the authority to acquire a building to be occupied by the State. Since renovation of the Diamond building is a necessary prerequisite to the State's ability to occupy this building, we also conclude that the Commission has the power to renovate the property it plans to acquire for use by the State.

We next must decide whether the Commission has the authority to enter the lease-purchase agreement proposed in this case. In analogous circumstances, we have determined a lease-purchase agreement to be a proper method of conducting projects such as the one contemplated by the Commission

and the DHHR.[13] For example, in *State ex rel. Clarksburg Mun. Bldg. Comm'n v. Spelsberg, supra,* we upheld the lease-purchase by the City of Clarksburg of a new municipal building constructed and financed by the Clarksburg Municipal Building Commission. We also approved a lease-purchase agreement between the Kanawha County Building Commission and the County Commission of Kanawha County whereby the building commission constructed a judicial annex building to be leased to the county commission. *State ex rel. Kanawha County Bldg. Comm'n v. Paterno,* 160 W.Va. 195, 233 S.E.2d 332 (1977). Based upon our prior decisions in this realm, we find that the lease-purchase agreement proposed in the instant case is an appropriate method by which the Charleston Building Commission may furnish the renovated property to, and may ultimately vest said property in, the State of West Virginia.

## C.

### *Authority of Commission to Issue Revenue Bonds or Certificates of Participation*

The Commission next contends that it has the authority to issue revenue bonds or certificates of participation in order to finance the contemplated Diamond building project. Moreover, the Commission maintains that the bond issuance does not violate West Virginia Constitution Article X, Section 8. Finally, the Commission claims that the anticipated rental payments to be paid by the State pursuant to the proposed lease-purchase agreement are constitutional in light of West Virginia Constitution Article X, Sections 4 and 6.

1. *Authority of Commission to issue bonds to finance property acquisition and renovation.*

The Commission asserts that it may properly issue bonds or certificates of participation to finance its acquisition and renovation of a building that it intends to lease to the State. The West Virginia Legislature has provided municipal building commissions

---

**13.** We will consider in more detail the propriety of the anticipated bond issuance for the Diamond building project in Section II.C., *infra.*

with broad statutory authority to issue bonds in order to raise revenue necessary to carry out their statutory powers. For example, W. Va.Code, 8–33–4(j) (1984), permits a municipal building commission to "[r]aise funds by the issuance and sale of revenue bonds[.]" In addition, W. Va.Code, 8–16–7(d) (1981), directs that a municipality may issue municipal revenue bonds "necessary to pay the cost of the [municipal public] works[,]" while W. Va.Code, 8–16–10 (1973), specifies which aspects of a public works project may be financed by bond revenue. Moreover, W. Va. Code, 8–16–11 (1969) provides:

> "Nothing in this article contained shall be so construed as to authorize or permit any municipality or municipalities to make any contract or incur any obligation of any kind or nature, except such as shall be discharged or payable solely from the funds provided under the authority of this article. Funds for the payment of the entire cost of the works shall be provided by the issuance of revenue bonds of the municipality or municipalities, the principal and interest of which bonds shall be payable solely from the special fund for such payment herein provided for, and said bonds shall not in any respect be a corporate indebtedness of such municipality or municipalities. All such bonds and the interest thereon, and all properties and revenues and income derived from such municipal public works, shall be exempt from all taxation by this State, or any county, municipality, political subdivision or agency thereof. All of the details of such bonds and the issuance thereof shall be determined by ordinance of the governing body or bodies."

*See also* W. Va.Code, 8–16–2 (1969) (providing that municipality shall not incur obligation when it issues revenue bonds to finance public works project); W. Va.Code, 8–16–4 (1969) (permitting governing body to lease municipal public works to lessee provid-ed rental payments provide sinking fund for payment of bonds and interest thereon). Finally, W. Va.Code, 8–33–4(h) (1984), permits a municipal building commission to "[s]ell, encumber or dispose of any property, real or personal."

Likewise, the Commission states that it has the authority to finance the proposed project by issuing certificates of participation. In this scenario, the certificates would be issued through a trustee and would encumber the property to secure repayment of the certificate holders should the State terminate the lease or default in rental payments. Therefore, the Commission would have no liability under the certificates of participation because the encumbrance on the property would ensure repayment of the investors.

Respondent Dial reiterates that the Commission's issuance of the proposed financial obligations necessary to finance its acquisition and renovation of the Diamond building is *ultra vires* in that the project will ultimately benefit the State of West Virginia rather than the City of Charleston. *Citing* W. Va. Code, 8–33–4(f). He further maintains that the Commission failed to authorize the proposed financing by ordinance. W. Va.Code, 8–16–11, requires the details of municipal bonds to be determined by ordinance. The ordinance process also requires a municipal corporation to read the proposed ordinance at at least two of its meetings. W. Va.Code, 8–11–4(a)(1) (1969). With regard to the proposed financing of the Diamond building project, the Commission has neither enacted any ordinance explaining the details of the bonds or certificates of participation nor read such an ordinance during two of its meetings. Rather, Dial asserts that the Commission merely resolved to accept the financial advisor services of Millennium, who would in turn develop the details of the proposed financing.[14] Amici Curiae acquiesce in respondent

---

**14.** Respondent Dial also recommends that this Court require ordinances to be passed by the affirmative vote of all members of the governing body as opposed to passage by a majority of those present and voting at the meeting. The May 16, 1996, resolution, whereby the Commission authorized respondent Dial to execute the Financial Advisor Agreement, apparently was passed by only two of the Commission's five members. Of the remaining three Commission members, respondent Dial abstained from voting, and the Commission's Chairman and Vice–Chairman previously had recused themselves from participating in Commission affairs regarding the Diamond building project. As we are examining the Commission's general authority to

Dial's arguments and assert that the Commission's inability to issue bonds or certificates of participation is delineated by statute. *Citing* W. Va.Code, 8–16–1 (1981) (defining "municipal public works").

W. Va.Code, 8–33–4(h), (i), and (j), specifically permit a municipal building commission to issue secured bonds or to otherwise raise funds by issuing revenue bonds:

> "Each commission shall have plenary power and authority to:
>
> \*     \*     \*     \*     \*     \*
>
> "(h) Sell, encumber or dispose of any property, real or personal;
>
> "(i) Issue negotiable bonds, notes, debentures or other evidences of indebtedness and provide for the rights of the holders thereof, incur any proper indebtedness and issue any obligations and give any security therefor which it may deem necessary or advisable in connection with exercising powers as provided herein;
>
> "(j) Raise funds by the issuance and sale of revenue bonds in the manner provided by the applicable provisions of sections seven, ten, twelve and sixteen [§§ 8–16–7, 8–16–10, 8–16–12 and 8–16–16], article sixteen of this chapter, without regard to the extent provided in section five [§ 8–33–5] of this article, to the limitations specified in said section twelve [§ 8–16–12], article sixteen, it being hereby expressly provided that for the purpose of the issuance and sale of revenue bonds, each commission is a 'governing body' as that term is used in said article sixteen [§ 8–16–1 et seq.] only[.]"

Additionally, we have recently noted that W. Va.Code, "8–33–4(i) grants broad authority in the realm of bond issuances[.]" *County Comm'n of Boone County v. Hill,* 194 W.Va. 481, 487, 460 S.E.2d 727, 733 (1995). In the instant case, the Commission's proposal to issue either bonds or certificates of participation, to be secured by the subject proper-

ty, in order to generate revenue for the acquisition and renovation of the Diamond building is consistent with its statutory authority.

At this point, we add a note of caution. Although we are concerned with the general authority of the Charleston Building Commission to issue bonds to finance the contemplated Diamond building project rather than with the specific manner in which such bonds will be issued, we nevertheless wish to emphasize the necessity of the Commission's strict compliance with the applicable statutory directives governing bond issuances. Specifically, we stress that the Charleston Building Commission must conform its proposed bond issuance to the requirements of W. Va.Code, 8–16–11, which directs that the details of contemplated municipal bonds be determined by ordinance; W. Va.Code, 8–33–4(j), which mandates compliance with several enumerated code sections as a prerequisite to issuing revenue bonds; and any, and all, other statutory provisions regulating the issuance of municipal bonds. The facts before this Court suggest that the Commission may not have complied with the ordinance requirement of W. Va.Code, 8–16–11. Notwithstanding this possible dereliction, we are unable to examine further whether the Commission has complied with the appropriate statutes because the precise method and terms of the proposed bond issuance are not before this Court. However, we do reiterate that the Commission must comply with *all* of the appropriate statutory mandates to ensure that its authority to issue bonds under the present circumstances will not be compromised.

■ Upon verifying the Commission's authority to issue bonds in this case, we must necessarily reject the contention of Amici Curiae that the Commission cannot issue the proposed bonds because they will not finance a "municipal public work" as that term is defined by W. Va.Code, 8–16–1.[15] It is true

issue revenue bonds in the instant case rather than the specifications of such a bond ordinance, we decline to address this precise issue at this time.

**15.** W. Va.Code, 8–16–1 (1981), provides:

"As used in this article, the terms 'municipal public works' or 'works' or 'projects' shall be construed to mean and include the construction, reconstruction, establishment, acquisition, improvement, renovation, extension, enlargement, increase, equipment, maintenance,

that a municipal building commission derives its authority, in large part, from the municipality by which it is created and that W. Va.Code, 8–16–7(d), provides that a municipality may issue revenue bonds to finance municipal public works. However, we refuse to construe the definition of municipal public works, which includes municipal and other public buildings, so narrowly as to exclude the acquisition and renovation project at issue in this case, particularly in light of our determination that the proposed Diamond building project is properly within the Commission's authority. Accordingly, we find that the Commission may issue bonds to finance its acquisition and renovation of the Diamond building, which will ultimately be leased to the State of West Virginia.

2. *Constitutionality of proposed issuance of bonds or certificates of participation with regard to West Virginia Constitution Article X, Section 8.*

■ The Commission submits further that the project's proposed financing, through the issuance of bonds or certificates of participation, does not violate West Virginia Constitution Article X, Section 8, which prohibits a municipal corporation from incurring excessive debt. West Virginia Constitution Article X, Section 8, provides, in relevant part:

"No ... city ... or municipal corporation, except in cases where such corporations have already authorized their bonds to be issued, shall hereafter be allowed to become indebted, in any manner, or for any purpose to an amount, including existing indebtedness, in the aggregate, exceeding five per centum on the value of the taxable property therein to be ascertained by the last assessment for State and county taxes, previous to the incurring of such indebtedness; nor without, at the same time, providing for the collection of a direct annual tax on all taxable property therein, in the ratio, as between the several classes or types of such taxable property, specified in section one of this article, separate and apart from and in addition to all other taxes for all other purposes, sufficient to pay, annually, the interest on such debt, and the principal thereof, within, and not exceeding thirty-four years.... Provided, that no debt shall be contracted under this section, unless all questions connected with the same, shall have been first submitted to a vote of the people, and have received three fifths of all the votes cast for and against the same."

The Commission states that this constitutional provision restricts a municipal corporation's ability to incur debt in the same manner that West Virginia Constitution Article X, Section 4, limits the State's indebtedness. *Citing State ex rel. Clarksburg Mun. Bldg. Comm'n v. Spelsberg, supra; State ex rel. Council of the City of Charleston v. Hall, supra. See also* Section II.C.3., *infra.* However, the Commission claims that the re-

repair (including replacements) and operation of jails, jail facilities, *municipal buildings*, police stations, fire stations, libraries, museums, *other public buildings*, incinerator plants, landfill or other garbage disposal systems, hospitals, piers, docks, terminals, airports, drainage systems, flood control systems, floodwalls, culverts, bridges (including approaches, causeways, viaducts, underpasses and connecting roadways), public markets, cemeteries, motor vehicle parking facilities (including parking lots, buildings, ramps, curb-line parking, meters and other facilities deemed necessary, appropriate, useful, convenient or incidental to the regulation, control and parking of motor vehicles), farms, dormitories, apartments and other housing facilities for the students and faculties of institutions of higher education; facilities providing housing for the elderly, including, but not limited to, life care facilities, congregate living facilities and adult residential facilities, stadiums, gymnasiums, sports arenas, auditoriums, public recreation centers, public recreation parks, swimming pools, roller skating rinks, ice skating rinks, tennis courts, golf courses, polo grounds, or the grading, regrading, paving, repaving, surfacing, resurfacing, curbing, recurbing, widening or otherwise improving of any street, avenue, road, alley or way, or the building or renewing of sidewalks, where such works or projects will be made self-supporting, and the cost thereof, together with the interest thereon, will be returned within a reasonable period, not exceeding forty years, by means of tolls, fees, rents, special assessments or charges other than taxation; and the terms shall mean and include any works or project as a whole, and all integral parts thereof, including all necessary, appropriate, useful, convenient or incidental appurtenances and equipment in connection with any one or more of the above." (Emphasis added).

quirement of permitting the electorate to ratify any proposed municipal debt does not pertain to the proposed project. Rather, the bonds, certificates of participation, or other financial obligations used to finance the acquisition and renovation of the Diamond building do not constitute unconstitutional debt. W. Va.Code, 8–33–5 (1975), specifically directs that:

> "No constitutional or statutory limitation with respect to the nature or amount of or rate of interest on indebtedness which may be incurred by municipalities, counties or other public or governmental bodies shall apply to the indebtedness of a commission. No indebtedness of any nature of a commission shall constitute an indebtedness of any municipality or county creating and establishing such commission or a charge against any property of said municipalities or counties. No indebtedness or obligation incurred by any commission shall give any right against any member of the governing body of any municipality or any member of the county commission of any county or any member of the board of any commission. The rights of creditors of any commission shall be solely against the commission as a corporate body and shall be satisfied only out of property held by it in its corporate capacity."

*See also* W. Va.Code, 8–16–12 (1981) (requiring issuer of bonds to state on face of bonds that municipality is not obligated to repay bonds or interest thereon except from those special funds designated for discharge of the municipality's bond obligation).

In sum, the Commission maintains that this Court has previously upheld the ability of governmental bodies in West Virginia to issue revenue bonds which did not violate the applicable constitutional provisions. *Citing State ex rel. Kanawha County Bldg. Comm'n v. Paterno, supra; State ex rel. County Court of Marion County v. Demus,* 148 W.Va. 398, 135 S.E.2d 352 (1964); *Chapman v. Huntington, W. Va., Hous. Auth.,* 121 W.Va. 319, 3 S.E.2d 502 (1939). Thus, the Commission requests this Court to uphold its

proposed financing scheme because it does not unconstitutionally obligate the City of Charleston.

Respondent Dial concedes that the bonds, certificates of participation, or other financial obligations necessary to finance the proposed project are not violative of constitutional provisions limiting a municipality's indebtedness. In response to this issue, Amici Curiae reply that the proposed lease-purchase agreement violates West Virginia Constitution Article X, Section 8.[16]

In *Spelsberg,* we observed that "Section 8 of Article X of the West Virginia Constitution is not designed to prohibit one municipal agency, the Building Commission, from issuing revenue bonds that are payable from rents from another municipal agency, the City, under the terms of the lease agreement in this case." 191 W.Va. at 558, 447 S.E.2d at 21. As discussed above, the lease-purchase agreement in *Spelsberg* was substantially similar to the proposed lease-purchase agreement in this case in that the monies received from the State's rental payments will be applied to discharge the Commission's bond obligation. Although *Spelsberg* involved a municipal corporation's lease to a municipality, we note the similarity of the arrangement in this case, a municipal corporation's lease to the State, in view of the special role the City of Charleston possesses vis-a-vis property transactions with the State. Therefore, based upon the facts presented by the parties concerning the proposed Diamond building project, we conclude that the Commission's contemplated bond issuance does not violate West Virginia Constitution Article X, Section 8, as it does not constitute an unconstitutional debt of a city or a municipal corporation.

3. *Validity of contemplated rental payments by State pursuant to West Virginia Constitution Article X, Sections 4 and 6.*

Finally, the Commission proposes that the rental payments by the State under the lease-purchase agreement do not constitute

**16.** For a more complete discussion of Amici Curiae's objection in this regard, *see* Section II.C.3., *infra.*

debt or credit of the State in violation of West Virginia Constitution Article X, Sections 4 and 6. West Virginia Constitution Article X, Section 4, provides:

"No debt shall be contracted by this State, except to meet casual deficits in the revenue, to redeem a previous liability of the State, to suppress insurrection, repel invasion or defend the State in time of war; but the payment of any liability other than that for the ordinary expenses of the State, shall be equally distributed over a period of at least twenty years."

Similarly, West Virginia Constitution Article X, Section 6, states, in pertinent part:

"The credit of the State shall not be granted to, or in aid of any county, city, township, corporation or person; nor shall the State ever assume, or become responsible for the debts or liabilities of any county, city, township, corporation or person[.]"

The Commission asserts that the rent payments required by the proposed lease purchase agreement do not constitute debt as they are merely periodic payments for services received by the State—the occupancy and use of the Diamond building. In this situation, the State may agree to the lease on a year-to-year basis, thereby committing itself to the lease for only one year at a time. The State also retains the right to terminate the lease at any time within each one-year period upon thirty days' notice to the Commission. Thus, the agreement does not require the State to pay all rent installments at one time; rather, the State pays only for services as they are rendered by the Commission. *Citing State ex rel. Lawrence v. Polan, supra; State ex rel. Clarksburg Mun. Bldg. Comm'n v. Spelsberg, supra; Winkler*

*v. State Sch. Bldg. Auth., supra; State ex rel. West Virginia Resource Recovery—Solid Waste Disposal Auth. v. Gill, supra.*

Moreover, the Commission claims that only the State, and not the Commission or the City of Charleston, will use and benefit from the renovated Diamond building. Lastly, this Court has previously held that the State may properly appropriate funds to carry out a public purpose. *Citing State ex rel. West Virginia Hous. Dev. Fund v. Waterhouse*, 158 W.Va. 196, 212 S.E.2d 724 (1974); *State ex rel. City of Charleston v. Coghill*, 156 W.Va. 877, 207 S.E.2d 113 (1973); *State ex rel. West Virginia Hous. Dev. Fund v. Copenhaver*, 153 W.Va. 636, 171 S.E.2d 545 (1969). In this instance, the State, as a party to the lease-purchase agreement, is fulfilling a public purpose: the consolidation of numerous divisions of the DHHR. Therefore, the rental payments required of the State pursuant to the lease-purchase agreement do not violate the West Virginia Constitution.

Respondent Dial agrees with the Commission's contention that the required rental payments do not constitute unconstitutional indebtedness of the State. By contrast, Amici Curiae assert that the proposed lease-purchase agreement between the Commission and the State is merely a method of bypassing stringent requirements accompanying the issuance of bonds by the State to obtain financing for the purchase of the renovated Diamond building.[17] Additionally, Amici Curiae suggest that this Court re-examine its prior decision in *Spelsberg, supra,* because that decision permits the governmental body acting as the lessee in a lease-purchase agreement to terminate the lease, leaving the bondholders with no recourse.[18] *Cf. Winkler*

---

**17.** It appears that the Division of Debt Management of the West Virginia State Board of Investments defines debt of the State to include lease purchases where the lease agreement is in excess of one year and rental payments are applied to the purchase price of equipment or facilities. W. Va. CSR, 113–10–2.6; 113–10–2.9. Pursuant to this definition of debt, the proposed lease-purchase agreement purportedly constitutes debt of the State.

**18.** Amici Curiae describe, in detail, a similar lease-purchase agreement whereby the State, as lessee, obtained office space at the Morris Square

building for the Workers' Compensation Division. After leasing the building for eight years of the twenty-year lease term, the State seemingly vacated the premises due to the building's deterioration. Owing approximately one million dollars in rental payments under the remaining, unexpired term of the lease, the State decided not to terminate the agreement, apparently fearing such cancellation would negatively impact its national bond rating. Consequently, Amici Curiae direct the Court's attention to this scenario in support of its position that the State should not be permitted to enter into the proposed lease-purchase agreement with the Commission.

*v. State Sch. Bldg. Auth., supra* (holding that bonds issued by State School Building Authority to finance school construction constitute debt of the State). Finally, Amici Curiae maintain that the proposed lease-purchase agreement violates West Virginia Constitution Article X, Sections 4 and 6.

In our prior cases, we have addressed the issue of a lease-purchase agreement between two governmental bodies, and the constitutionality of this arrangement pursuant to West Virginia Constitution Article X, Sections 4 and 6. We noted that

" 'Section 4 of Article X of the West Virginia Constitution is not designed to prohibit the State or the state's agencies from issuing revenue bonds that are to be liquidated from contracts requiring rental payments from another state agency or from contracts for necessary services such as utilities; nor does this constitutional provision preclude the issuance of revenue bonds which are to be redeemed from a special fund.' Syllabus point 6, *Winkler v. State School Building Authority,* 189 W.Va. 748, 434 S.E.2d 420 (1993)." Syl. pt. 2, *State ex rel. Lawrence v. Polan,* 192 W.Va. 629, 453 S.E.2d 612 (1994).

In arriving at this conclusion, we observed that such rental payments are generally constitutional because they do not constitute future indebtedness of the State. Rather, the total amount of the obligation is definitely ascertainable as commensurate with the property's original purchase price, and each monthly rent installment ordinarily is due only in connection with the State's receipt of the use of the property for that specific time period. *See Spelsberg,* 191 W.Va. at 556–58, 447 S.E.2d at 19–21. The current scenario mirrors these general characteristics of the constitutional lease-purchase agreements as the rental payments apparently will be determined by the cost to the Commission to acquire and renovate the Diamond building and will be due at intervals contemporaneous with the State's use of the property. Moreover, it seems ·that the State will not be obligated to continue to lease the property indefinitely as the proposed lease-purchase agreement apparently will contain a provi-

sion whereby the State may terminate the lease upon thirty days' notice.

We further have noted in Syllabus Point 5 of *Winkler v. State Sch. Bldg. Auth., supra,* that:

"The plain language of Section 6 of Article X of the West Virginia Constitution is designed to restrict the State from granting credit to subordinate political subdivisions such as municipalities and counties, as well to forbid the State from granting credit or assuming liabilities for debts of private persons or other entities."

Upon the facts presented by the parties, we find that the prohibition provided by this constitutional provision is not compromised in the instant case. As we discussed above, the contemplated lease-purchase agreement does not constitute an unconstitutional debt of the State. Neither does the proposed arrangement result in an unconstitutional extension of the State's credit. The Commission contends that the anticipated lease-purchase enterprise will be financed by the issuance of bonds or certificates of participation to be secured by the acquired and renovated Diamond building. It will conceivably be the holders of these obligations, and not the State, who will be issuing credit to the Charleston Building Commission to proceed with this project. Consequently, the State, by tendering its rental payments, will not be assuming a debt of the Commission or otherwise extending credit to it. Rather, the State's rental payments will merely be reimbursements for those services it has received: the use of the rental property. In this respect we have concluded that:

"Long term contracts for the purchase of necessary services, such as electricity and water, have long been held not to violate constitutional and statutory provisions prohibiting municipal corporations from incurring indebtedness, when the agreements specify that periodic installments will be paid as the service is furnished." *State ex rel. Council of City of Charleston v. Hall,* 190 W.Va. 665, 668, 441 S.E.2d 386, 389 (1994). (Citations omitted).

Thus, it stands to reason that if this long-term contract does not constitute an uncon-

stitutional indebtedness of the State neither can it constitute an unconstitutional extension of the State's credit since the State is merely paying for services it has received as those services are furnished. Therefore, we find that the anticipated rental payments by the State pursuant to the proposed lease-purchase agreement do not violate West Virginia Constitution Article X, Sections 4 and 6.

### III.

### CONCLUSION

For the foregoing reasons, we hold that the Charleston Building Commission has the authority to acquire, renovate, and lease, pursuant to a lease-purchase agreement, property to the State of West Virginia to be used solely for state purposes. Accordingly, the writ of mandamus is granted.

Writ granted.

RECHT, J., sitting by temporary assignment.